02-11-560,561-CR








 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00561-CR

 

 









 
 
 Michael
 Fred Wehrenberg
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 43rd District Court
  
 of
 Parker County (CR11-0091)
  
 November
 8, 2012
  
 Opinion
 by Justice Meier
  
 (p)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
error in the trial court’s order.  It is ordered that the trial court’s order
denying Michael Fred Wehrenberg’s motion to suppress in part is reversed and
this case is remanded for further proceedings consistent with this opinion.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

    Justice Bill Meier

 

 



 




 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00560-CR

NO. 02-11-00561-CR

 

 


 
 
 Michael Fred Wehrenberg
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 43rd
District Court OF Parker COUNTY

----------

OPINION

----------

I.  Introduction

          Appellant
Michael Fred Wehrenberg appeals the trial court’s denial in part of his motion
to suppress evidence.  We consider several dispositive issues in this appeal,
including (1) whether facts that a person is “going to” manufacture
methamphetamine provides exigent circumstances justifying a warrantless entry
into a residence, and (2) whether the federal independent source doctrine applies
to except the challenged evidence from the Texas exclusionary rule.  Our answer
to both queries:  No.  We will reverse the trial court’s orders denying in part
Wehrenberg’s motion to suppress evidence and remand this cause to the trial
court.

II.  Background

          Police
had been conducting surveillance of a residence located at 501 Center Point
Road in Parker County for about thirty days when on or about August 31,
2010, a confidential informant notified investigators that a number of
individuals who were located at the residence were “fixing to” cook
methamphetamine.  A few hours later, police officers, including Investigator
Luis Montanez, proceeded to the residence and, without a search warrant, entered
through the front door; removed several “subjects”—including Wehrenberg—from
inside and placed them in the front yard, handcuffed; and performed a
protective sweep of the premises.  No one had given the police permission to
enter the residence, and no one was cooking methamphetamine when the police arrived
and “secured” the residence.  Investigator Montanez prepared a search warrant
affidavit with the help of another investigator, and about an hour after police
had secured the residence, a magistrate signed a warrant authorizing a search
of the residence.  Police then searched the residence and discovered the
following items, among others:  a coffee grinder with residue, Oxycodone,
lithium batteries, empty blister packets, a vial with liquid, red and clear
liquid, wet powder inside of a shed, stripped lithium batteries, and empty
pseudoephedrine boxes.  Police arrested Wehrenberg after conducting the search.

          Wehrenberg
moved to suppress all of the tangible evidence seized in connection with both cases.
 The trial court granted the motion to suppress as to any evidence seized pursuant
to the initial “detention” of Wehrenberg but denied the motion as to any
evidence seized pursuant to the search warrant that police later obtained and
executed.  The trial court did not enter findings of fact and conclusions of
law, although Wehrenberg requested such findings and conclusions.  Wehrenberg ultimately
pleaded guilty, pursuant to a plea bargain, to (a) possession of between
four and two hundred grams of methamphetamine and (b) possession or
transport of chemicals with the intent to manufacture methamphetamine, and the
trial court sentenced him to five years’ confinement in each cause.  Wehrenberg
preserved his right to appeal the trial court’s denial in part of his motion to
suppress.

III. 
Methamphetamine, Warrantless
Entry, and
Segura

 

          Wehrenberg
argues in his only point that the trial court reversibly erred by denying in
part his motion to suppress.  He contends that in light of the trial court’s
determination that the initial warrantless entry into the residence was illegal,
his detention and removal from the residence was illegal, and “such illegality
tainted the subsequently obtained search warrant for the residence.”  Wehrenberg
argues that the independent source doctrine does not apply to allow admission
of the complained-of evidence despite the illegal taint because “the search
warrant was not based entirely on information obtained before the illegal entry.”

          The
State argues that the trial court did not err by denying Wehrenberg’s motion to
suppress because probable cause and exigent circumstances justified the
warrantless entry and, alternatively, the independent source doctrine applies
to except the evidence from the exclusionary rule.

          A.      Standard
of Review

          We
review a trial court’s ruling on a motion to suppress evidence under a
bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  We give almost total deference to a trial court’s rulings on
questions of historical fact and application-of-law-to-fact questions that turn
on an evaluation of credibility and demeanor, but we review de novo
application-of-law-to-fact questions that do not turn on credibility and
demeanor.  Amador, 221 S.W.3d at 673; Estrada v. State, 154
S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson v. State, 68 S.W.3d 644,
652–53 (Tex. Crim. App. 2002).

          When
the record is silent on the reasons for the trial court’s ruling, or when there
are no explicit fact findings and neither party timely requested findings and
conclusions from the trial court, we imply the necessary fact findings that
would support the trial court’s ruling if the evidence, viewed in the light
most favorable to the trial court’s ruling, supports those findings.  State
v. Garcia-Cantu, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); see Wiede
v. State, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).  We then review the
trial court’s legal ruling de novo unless the implied fact findings
supported by the record are also dispositive of the legal ruling.  State v. Kelly,
204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

          B.      Legality
of Warrantless Entry

          We
begin our analysis by considering whether the initial warrantless entry into
the residence by police was legal.  This is a logical starting point because if
the warrantless entry was justified, then there was no residual taint that could
have rendered the subsequent search invalid, and Wehrenberg’s argument—which
presupposes the illegality of the warrantless entry—fails.  And although the
trial court suppressed any evidence seized pursuant to the initial detention of
Wehrenberg, we may still review the legality of the warrantless entry because
we are required to uphold the trial court’s ruling denying the motion to
suppress if it is supported by the record and correct under any theory of law
applicable to the case, even if the trial court gave the wrong reason for its
ruling.  See State v. Stevens, 235 S.W.3d 736, 740 (Tex. Crim.
App. 2007); Armendariz v. State, 123 S.W.3d 401, 404 (Tex. Crim. App.
2003), cert. denied, 541 U.S. 974 (2004).

                   1.       Exigent
Circumstances

          An
unconsented police entry into a residence constitutes a search.  McNairy v.
State, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991); see Parker v. State,
206 S.W.3d 593, 596 n.7 (Tex. Crim. App. 2006).  A warrantless search of a
residence is presumptively unreasonable.  Gutierrez v. State, 221 S.W.3d
680, 685 (Tex. Crim. App. 2007).  For a warrantless search to be justified, the
State must show (1) the existence of probable cause at the time of the
search and (2) exigent circumstances that made procuring a warrant
impracticable.[1]  McNairy, 835
S.W.2d at 106; see Estrada, 154 S.W.3d at 608.  If either probable cause
or exigent circumstances are not established, a warrantless entry will not pass
muster under the Fourth Amendment.  Parker, 206 S.W.3d at 597.

                             a.       Probable
Cause

          Probable
cause to search exists when reasonably trustworthy facts and circumstances
within the knowledge of the officer on the scene would lead a man of reasonable
prudence to believe that the instrumentality of a crime or evidence of a crime
will be found.  McNairy, 835 S.W.2d at 106.  Probable cause has been
described as “the sum total of layers of information and the synthesis of what
the police have heard, what they know, and what they observe as trained
officers.  We weigh not individual layers but the ‘laminated total . . . [.]’” 
See id. (citing Brinegar v. United States, 338 U.S. 160,
69 S. Ct. 1302 (1948)).

          Investigator
Montanez testified at the hearing on the motion to suppress that a confidential
informant had notified him that the occupants of the residence located at 501
Center Point Road were preparing to cook methamphetamine.  Investigators had used
the confidential informant in the past, and the informant, who was familiar
with methamphetamine and the manufacture of methamphetamine, had provided reliable
information.  In this circumstance, the informant gave Investigator Montanez
specific information about the method by which the methamphetamine was being
manufactured, and based on Investigator Montanez’s knowledge and experience, he
determined that the occupants of the residence were utilizing the “shake-and-bake”
method, which involves combining numerous ingredients into a plastic bottle.  Investigator
Montanez said that he corroborated the informant’s information by running a
check of the names of the people who were apparently inside of the residence,
which had been under police surveillance.  Investigator Montanez explained that
he knew that Wehrenberg was at the residence because police had performed a
“knock and talk” at the same location about three months earlier, resulting in a
warrant being subsequently issued and Wehrenberg being arrested for possession
of a controlled substance.

          Given
the sum total of information available to Investigator Montanez, including the
reasonable inferences that could be drawn from that information, probable cause
existed at the time of the warrantless entry into the residence.

                             b.       Exigent
Circumstances

          Three
categories of exigent circumstances justify a warrantless intrusion by police
officers:  providing aid or assistance to persons whom law enforcement
reasonably believes are in need of assistance; protecting police officers from
persons whom they reasonably believe to be present, armed, and dangerous; and preventing
the destruction of evidence or contraband.  Gutierrez, 221 S.W.3d at
685.  Investigator Montanez testified that he secured the residence without a
warrant “to prohibit destruction of evidence.”

          Regarding
destruction of evidence as an exigent circumstance, the State must show “that
the police could have reasonably concluded that evidence would be destroyed or
removed before they could obtain a search warrant.”  McNairy, 835 S.W.2d
at 107.  Circumstances relevant to a reasonable determination by searching
officers that evidence might be destroyed or removed before they could obtain a
search warrant include (1) the degree of urgency and the amount of time
necessary to obtain a warrant, (2) the reasonableness of the belief that
the contraband is about to be removed, (3) the possibility of danger to
the police officers securing the site while a search is sought, (4) the
suspects’ awareness of police presence or surveillance, and (5) the ready
destructibility of the contraband.  Id. (citing United States v.
Rubin, 474 F.2d 262, 268 (3d Cir.), cert. denied, 414 U.S. 833 (1973)).

          The
State concedes that there is no evidence to support the third and fourth criteria
set out immediately above, but it argues that there is evidence to support the first,
second, and fifth criteria.  Specifically, the State directs us to Investigator
Montanez’s testimony that police secured the residence without a warrant
because “we were advised by the CI that the subjects were going to cook methamphetamine
prior to the Search Warrant.  So we had to go in and secure the residence.”  Investigator
Montanez explained that the confidential informant had told him that the
occupants of the residence “were fixing to cook methamphetamine.”  From this testimony,
the State identifies two reasons why exigent circumstances justified the warrantless
entry:  (1) the volatile nature of manufacturing methamphetamine, including
by using the “shake-and-bake” method; and (2) the inevitable “destruction”
of various chemicals that, when combined, are used to manufacture
methamphetamine.

          Investigator
Montanez explained that the process of manufacturing methamphetamine may cause
volatile and hazardous conditions, including fires and explosions.  Regarding
the “shake-and-bake” method, Investigator Montanez said that “the chemical
reaction in the process of making [methamphetamine] can burn a hole through the
bottom of the bottle, which can cause a huge fire.  It can go up pretty
quick.”  He related a past experience in which he and several other officers
had conducted a “knock-and-talk” at a suspected methamphetamine lab, and after
the subject opened and then slammed the door shut, a fire started inside of the
building and caused an explosion.[2]  In fact, Investigator
Montanez had noted in his report that “one of [the subjects inside the
residence] had already attempted to make [methamphetamine] and they had burned
themselves.  They’d already caused a fire in the house once already.”  Thus,
according to the investigator, “I was afraid that they would begin making the
methamphetamine and then a fire would break out.”  However, despite his concern
about a fire, Investigator Montanez agreed with the trial court that “[m]ost
people don’t blow themselves up making this stuff”; “[t]hey unfortunately
successfully make methamphetamine for use and distribution.”

          Regarding
the State’s contention that chemicals are “destroyed” when combined to
manufacture methamphetamine, it points to Investigator Montanez’s testimony
explaining the “shake-and-bake” method.  He testified,

          It’s where
they combine all their ingredients, such as lithium batteries, the
pseudoephedrine, various chemicals such as drain cleaner, sulphuric acid.  They
basically put all this inside a bottle, at which point when they drop the
lithium battery, it causes a reaction with the water and all the other
ingredients involved.

 

          And then they shake it up and it creates a gas
which separates the pseudoephedrine from the pill, which makes
methamphetamine.  And methamphetamine usually sits at the top of it after it’s
done, which causes a fire reaction and things of that nature.

The
State argues,

          In light of this testimony and reviewing the
definition of what it means to ‘manufacture’ a controlled substance, it can be
concluded that some of the chemicals, especially the pseudoephedrine, are
‘destroyed’ during the production process by its conversion via ‘chemical
synthesis’ into methamphetamine, possession of which is a separate criminal
offense which was also then being investigated.  [citations omitted]

          Imminence
is a critical, sometimes dispositive, aspect of an exigent circumstances
inquiry.  The United States Supreme Court recognized this in Roaden v.
Kentucky, wherein it reasoned, “Where there are exigent circumstances in
which police action literally must be ‘now or never’ to preserve the
evidence of the crime, it is reasonable to permit action without prior judicial
evaluation.”  413 U.S. 496, 505, 93 S. Ct. 2796, 2802 (1973) (emphasis
added).  Courts, including the Supreme Court, even go so far as to specifically
refer to the destruction-of-evidence category of exigent circumstances as the “imminent
destruction of evidence.”  See, e.g., Welsh v. Wisconsin, 466
U.S. 740, 754, 104 S. Ct. 2091, 2100 (1984) (“[M]ere similarity to other
cases involving the imminent destruction of evidence is not sufficient.”); United
States v. Dawkins, 17 F.3d 399, 405 (D.C. Cir. 1994) (“We have long
recognized that the imminent destruction of evidence may constitute an exigency
excusing the failure to procure a warrant.”); United States v.
Sangineto-Miranda, 859 F.2d 1501, 1512 (6th Cir. 1988) (“When police
officers seek to rely on this exception in justifying a warrantless entry, they
must show an objectively reasonable basis for concluding that the loss or
destruction of evidence is imminent.”).

          Texas
courts considering whether exigent circumstances justified a warrantless entry
to prevent the destruction or removal of evidence also must consider imminence;
the first, second, and fifth McNairy criteria—the degree of urgency
and the amount of time necessary to obtain a warrant, the
reasonableness of the belief that the contraband is about to be removed,
and the ready destructibility of the contraband—each impliedly reference
the requirement that the destruction or removal of evidence be imminent.  See
McNairy, 835 S.W.2d at 107.  Caselaw analyzing exigent circumstances
reflects this.  In McNairy, exigent circumstances justified a
warrantless entry because police smelled the strong odor of methamphetamine
emanating from a trailer, heard the back door of a trailer thrown open and
people running into the brush, and anyone remaining in the trailer would have
known that the police were on the scene, and the people could have destroyed
the evidence in a matter of minutes.  McNairy, 835 S.W.2d at 103, 107. 
In Estrada, exigent circumstances permitted a warrantless entry into a
residence from which the odor of marijuana was emanating because a police
officer heard voices and running inside of the residence when he knocked and
observed several people attempting to leave the residence before he returned a
second time to investigate further.  Estrada, 154 S.W.3d at 609–10.  And
in Parker v. State, exigent circumstances existed for a warrantless
entry into a residence because officers smelled burned marijuana, heard someone
inside the residence announce that the police were at the front door when they
approached, and observed someone running upstairs after the announcement.  223
S.W.3d 385, 388–89 (Tex. App.—Amarillo 2005), aff’d, 206 S.W.3d 593
(Tex. Crim. App. 2006).  In each of those cases, exigent circumstances
justified a warrantless entry because the police could have reasonably
concluded that the destruction or removal of evidence before a search warrant
could be obtained was imminent.

          Cases
involving the manufacture of methamphetamine are no exception to the imminence
requirement.  In United States v. Rhiger, federal drug agents observed
appellant drive to several locations and purchase materials used to manufacture
methamphetamine.  315 F.3d 1283, 1285 (10th Cir.), cert. denied, 540
U.S. 836 (2003).  About an hour after the agents saw appellant enter a
residence with the purchased materials, they “detected the smell of cooking
methamphetamine.”  Id.  “Fearing an active methamphetamine lab was in
the residence and could explode,” the agents entered the home without a
warrant, found an “active” lab in the garage, and arrested appellant.  Id. 
Observing that the “government presented evidence indicating the federal agents
had reasonable grounds to believe there was an immediate need to protect
themselves and the public from the potential explosion of the methamphetamine
lab,” the court held that exigent circumstances justified the warrantless entry
in light of, among other things, “the strong odor of cooking
methamphetamine emitting from” the residence and the agent’s “knowledge of the
inherent dangerousness of an active methamphetamine lab.”  Id. at
1288–89 (emphasis added).

          In
United States v. Walsh, officers received an anonymous tip that two
people were operating a methamphetamine lab at a particular residence.  299
F.3d 729, 730–31 (8th Cir.), cert. denied, 537 U.S. 1066 (2002). 
Officers were given consent to search all but two parts of the residence—a back
bedroom and a storage shed.  Id. at 731.  While outside near the storage
shed, an officer noticed empty cans of fluid on the back porch, an extension
cord running to the storage shed, white residue inside a blender pitcher,
two-liter soda bottles, and the strong smell of ether.  Id.  The officer
opened the door to the shed and, among other things, noticed a “white mist
hanging in the air.”  Id.  Police later obtained a warrant and searched
the shed and back bedroom.  Id. at 732.  The court of appeals held that
exigent circumstances justified the warrantless entry into the storage shed
because “the strong smell of ether and the equipment and residue found in the
carport area suggested on-going manufacture in the shed.”  Id. at
734 (emphasis added).  According to the court, “Officer Cantrell could not be
certain no one was hiding (or worse yet, lying unconscious) in the shed, and
officer McPhail was justified in verifying that no untended heat source
was creating an imminent risk of fire or the explosion of volatile chemicals.” 
Id. (emphasis added).

          In
United States v. Wilson, exigent circumstances justified a warrantless
entry into a house because officers smelled ether, which is commonly present
during the manufacture of methamphetamine; saw a liquid, which smelled like
ether, pouring out of the garage; heard movements from within the garage; and
after arresting two people on the doorstep of the house, reasonably believed
that other persons might be inside the house who could attempt to destroy
evidence.  865 F.2d 215, 216–17 (9th Cir. 1989).  The court noted that one of
the officers “recognized a pressing need to prevent the ether from exploding
and causing a fire.”  Id. at 217.

          Thus,
whether it was the odor of ether, ether running on the ground, or the
observance of articles associated with the ongoing manufacture of
methamphetamine, in each of the three preceding cases, officers observed facts that
led them to believe that someone was actively manufacturing
methamphetamine.  This fact was significant to the exigent-circumstances
inquiry because it sustained the officers’ belief that the destruction or
removal of evidence was imminent—a result that could have occurred due to the
inherent volatility associated with the active manufacture of methamphetamine.

          Here,
unlike the officers in Rhiger, Walsh, and Wilson,
Investigator Montanez did not testify that he observed anything that led him to
believe that someone was actively manufacturing methamphetamine at the
residence.  Instead, the record demonstrates (1) that Investigator
Montanez had information that the occupants of the residence were “going to” or
“fixing to” manufacture methamphetamine, and (2) that officers arrived at
the residence and entered without a warrant.[3]  Therefore, notwithstanding
that a fire was alleged to have previously occurred at some point at the
residence as a result of manufacturing methamphetamine, in the absence of any
evidence that could have led the officers to believe that someone was actively
manufacturing methamphetamine, officers could not have reasonably concluded
that the destruction or removal of evidence was imminent due to either the
inherently volatile nature of manufacturing methamphetamine or the
inevitable “destruction” of various chemicals when combined to manufacture
methamphetamine.  See, e.g., State v. Meeks, 262 S.W.3d 710,
726–27 (Tenn. 2008) (holding that hazards posed by actively operating
methamphetamine lab created exigent circumstances justifying warrantless
search); Williams v. State, 995 So.2d 915, 921 (Ala. 2008) (“Based on
the inherent dangers of an operating methamphetamine lab, we now hold
that discovery of such a lab by law-enforcement officials constitutes an
exigent circumstance justifying a warrantless search” (emphasis added)); State
v. Bilynsky, 932 A.2d 1169, 1176 (Me. 2007) (holding that exigent
circumstances justified warrantless entry because officers observed facts
demonstrating that manufacturing methamphetamine was “in progress”); Bishop
v. Commonwealth, 237 S.W.3d 567, 570 (Ky. Ct. App. 2007) (“[T]he court did
not clearly err by finding that a search was justified by the exigent
circumstances created when an active methamphetamine lab was found in
the trunk of a car . . . .” (emphasis added)).  Although
probable cause existed at the time of the warrantless entry, there is nothing
in the record to indicate that the officers were confronted with a “now or
never”-type situation, one in which they had to act before obtaining a warrant
in order to head off the possible destruction or removal of evidence caused by
the volatility inherently associated with the actual manufacture of
methamphetamine.  See Roaden, 413 U.S. at 505, 93 S. Ct. at 2802; State
v. Moore, 183 P.3d 158, 161 (N.M. Ct. App. 2008) (reasoning that “mere
probable cause that a methamphetamine lab exists is not per se an
exigent circumstance that will justify a warrantless entry into a home”
(emphasis added)).  Contrary to the State’s argument, the first, second, and
fifth McNairy criteria do not support a conclusion that exigent circumstances
justified the warrantless entry.  Accordingly, we may not affirm the trial
court’s denial of Wehrenberg’s motion to suppress on this ground.

                   2.       Emergency
Doctrine

          Investigator
Montanez agreed with the trial court that a “community caretaking function”
existed to establish exigent circumstances, but the State has expressly declined
to provide any argument thereunder.  In light of Investigator Montanez’s
testimony, we feel compelled to address this issue because it is another basis
upon which we could potentially affirm the trial court’s orders denying in part
Wehrenberg’s motion to suppress.  See Stevens, 235 S.W.3d at 740;
Armendariz, 123 S.W.3d at 404.

          In
Laney v. State, the court of criminal appeals explained that the
“community caretaker functions” serve as a basis for three separate exceptions
to the warrant requirement, one being the emergency doctrine.  117 S.W.3d 854,
860 (Tex. Crim. App. 2003).  The emergency doctrine “applies when the police
are acting, not in their ‘crime-fighting’ role, but in their limited community
caretaking role to ‘protect or preserve life or avoid serious injury.’”  Id.
at 861.  The court of criminal appeals said,

          “We have
used an objective standard of reasonableness in determining whether a
warrantless search is justified under the Emergency Doctrine.”  This objective
standard looks at the police officer’s conduct and “takes into account the
facts and circumstances known to the police at the time of the search.” 
Furthermore, we look to ensure that the warrantless search is “strictly
circumscribed by the exigencies which justify its initiation.”

 

Id. at
862 (citations omitted).

          Here,
we cannot conclude that the actions of Investigator Montanez and the police were
“totally divorced from the detection, investigation, or acquisition of evidence
relating to the violation of a criminal statute.”  Laney, 117 S.W.3d at
862 (quoting Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523,
2528 (1973)).  Police had been conducting surveillance of the residence for
some time, and after entering the residence, police handcuffed the occupants, obtained
the warrant, searched the residence, and discovered evidence that led to these prosecutions. 
As the court of criminal appeals has observed, “[t]here is a difference between
rendering emergency aid and investigating the possibly criminal cause of the
emergency.  The emergency doctrine justifies the former, but it does not always
justify the latter.”  Bray v. State, 597 S.W.2d 763, 768 (Tex. Crim.
App. [Panel Op.] 1980).

          Moreover,
although Investigator Montanez expressed a concern about the possibility of a
fire resulting from the manufacture of methamphetamine, as thoroughly explained
above, there is no evidence that someone was manufacturing methamphetamine.

          We
hold that the emergency doctrine could not have justified the officers’
warrantless entry into the residence.  Therefore, we may not affirm the trial
court’s denial of Wehrenberg’s motion to suppress on this ground.

          C.      Segura
Issues

          Both
Wehrenberg and the State direct us to Segura v. United States, 468 U.S.
796, 104 S. Ct. 3380 (1984).  Wehrenberg argues that the independent
source doctrine, as articulated and applied in Segura, is irrelevant
under the facts of this case.  The State argues that two different holdings in Segura
apply to allow admission of the challenged evidence—the holding regarding the
independent source exception and the holding addressing Segura’s seizure
argument.

          Police
arrested Segura in his apartment building on charges that he had sold cocaine. 
Id. at 800, 104 S. Ct. at 3383.  They escorted him up to his
apartment and knocked on the door.  Id.  When a lady answered the door,
the officers entered the apartment with Segura, without requesting or receiving
permission, and informed several others in the apartment that Segura was under
arrest and that a search warrant for the apartment was being obtained.  Id. 
The police conducted a limited security check of the apartment and noticed
several items of contraband, which they left undisturbed.  Id. at 800–01,
104 S. Ct. at 3383.  The search warrant was issued approximately nineteen
hours later, upon which the police conducted a more thorough search of the
apartment and found drugs, cash, and ammunition for a firearm.  Id.

          The
district court suppressed all of the evidence seized from the apartment—the
items discovered in plain view during the initial search and the items not in
plain view that were discovered during the subsequent warrant search.  Id.
at 801–02, 104 S. Ct. at 3383–84.  The court of appeals affirmed the
district court as to the evidence discovered in plain view, holding that the
evidence was properly suppressed because the warrantless entry was not
justified by exigent circumstances.  Id. at 802, 104 S. Ct. at
3384.  But the court of appeals reversed the district court’s judgment as to
the evidence seized under the valid search warrant.  Id. at 803, 104 S. Ct.
at 3384.

          The
Supreme Court was careful to indicate at the outset of its opinion that the
Government had not challenged the portion of the lower court’s opinion
holding that exigent circumstances did not justify the initial
warrantless entry.  Id. at 804, 104 S. Ct. at 3385.  Thus, the only
issue before the Court was “whether drugs and the other items not observed
during the initial entry and first discovered by the agents the day after the
entry, under an admittedly valid search warrant, should have been suppressed.” 
Id.  It being undisputed that the initial warrantless entry (or search)
was illegal, Segura took the opportunity to argue that an illegal seizure
had also occurred, contending “that all of the contents of the apartment, seen
and not seen, including the evidence now in question, were ‘seized’ when the
agents entered and remained on the premises while the lawful occupants were
away from the apartment in police custody.”  Id. at 805, 104 S. Ct.
at 3386 (emphasis added).  The Court observed that Segura had apparently
advanced the argument in an attempt to avoid application of the independent
source exception.  Id. at 806, 104 S. Ct. at 3386.  Indeed, “[i]f
all the contents of the apartment were ‘seized’ at the time of the illegal
entry and securing,” then, as Segura’s argument proceeded, “presumably the
evidence now challenged would be suppressible as primary evidence obtained as a
direct result of that entry.”  Id.  But the Court disagreed with
Segura’s argument, pointed out that “[a] seizure affects only the person’s
possessory interests; a search affects a person’s privacy interests,” and
observed that it “has frequently approved warrantless seizures of property, on
the basis of probable cause, for the time necessary to secure a warrant, where
a warrantless search was either held to be or likely would have been held
impermissible.”  Id.  The Court held “that securing a dwelling, on the
basis of probable cause, to prevent the destruction or removal of evidence
while a search warrant is being sought is not itself an unreasonable seizure of
either the dwelling or its contents.  We reaffirm at the same time, however,
that, absent exigent circumstances, a warrantless search . . . is
illegal.”  Id. at 810, 104 S. Ct. at 3388.

          After
addressing Segura’s seizure argument, the Supreme Court considered the
admissibility of the evidence obtained pursuant to the search warrant and observed
that “[n]one of the information on which the warrant was secured was derived
from or related in any way to the initial entry into [Segura’s] apartment; the
information came from sources wholly unconnected with the entry and was known
to the agents well before the initial entry.”  Id. at 814, 104 S. Ct.
at 3390.  The Court thus held:

[T]he evidence discovered during the subsequent search of
the apartment the following day pursuant to the valid search warrant issued
wholly on information known to the officers before the entry into the apartment
need not have been suppressed as “fruit” of the illegal entry because the
warrant and the information on which it was based were unrelated to the entry
and therefore constituted an independent source for the evidence under Silverthorne
Lumber Co. v. United States, 251 U.S. 385, 40 S. Ct. 182, 64 L.Ed. 319
(1920).

Id. at
799, 104 S. Ct. at 3382.

          1.       Segura’s
Seizure Analysis

          The
State argues that the trial court could have denied Wehrenberg’s motion to
suppress based on the Supreme Court’s holding addressing Segura’s seizure
argument, in which the Court stated,

[W]here officers, having probable cause, enter premises,
and with probable cause, arrest the occupants who have legitimate possessory
interests in its contents and take them into custody and, for no more than the
period here involved, secure the premises from within to preserve the status quo
while others, in good faith, are in the process of obtaining a warrant, they do
not violate the Fourth Amendment’s proscription against unreasonable seizures.

Id. at
798, 104 S. Ct. at 3382.

          The
State misreads Segura.  Segura argued that an illegal seizure of the
apartment’s contents had occurred in an effort to head off any application of
the independent source doctrine.  The Supreme Court, however, held that there
was no illegal seizure and proceeded to apply the independent source doctrine. 
The Court did not hold that the challenged evidence was admissible because
there was no illegal seizure, as the State suggests.  Indeed, that holding
would have rendered the entire discussion of the independent source doctrine
dicta.  The evidence was instead admissible as a result of the independent
source doctrine, which applied notwithstanding the undisputed illegality of the
initial warrantless entry.  Accordingly, the trial court could not have denied
Wehrenberg’s motion to suppress on this ground.

                   2.       Independent
Source Doctrine

          In
addition to Segura’s discussion, the Fifth Circuit has concisely
explained the independent source doctrine as follows:

          The exclusionary rule of the Fourth Amendment
generally prohibits the introduction at trial of not only primary evidence
obtained as a direct result of an illegal search or seizure, but also evidence
discovered later that is derivative of an illegality, or constitutes “fruit of
a poisonous tree.”  The primary limit on this rule is that otherwise
suppressible evidence will still be admitted if the connection between the
alleged illegality and the acquisition of the evidence is “so attenuated as to
dissipate the taint.”  One example of this “attenuation” limit is known as the
“independent source” doctrine, which permits the introduction of unlawfully
discovered evidence when the police have acquired that evidence through a
distinct, untainted source.  Animating this doctrine is the recognition that
the goal of the exclusionary rule is to put the police “in the same, not a worse,
position that they would have been in if no police error or misconduct had
occurred.”  “When the challenged evidence has an independent source, exclusion
of such evidence would put the police in a worse position than they would have
been in absent any error or violation.”

United
States v. Grosenheider, 200 F.3d 321, 327 (5th Cir. 2000)
(citations omitted).

          Here,
Investigator Montanez testified that all of the information contained in the
search warrant affidavit was derived from facts that were made known to him by
the confidential informant before the warrantless entry into the residence.  We
have reviewed the affidavit, and Investigator Montanez’s testimony is
accurate.  Because the police did not rely upon any of the information that
they may have gleaned during the initial warrantless entry to support their
request for a search warrant, this case would appear to fall squarely within the
parameters of the independent source doctrine.  However, we have declined to
apply the doctrine in a previous case.  In Oliver v. State, citing the
Texas exclusionary rule, we reasoned as follows:

          The [federal] “independent source” and
“inevitable discovery” exceptions advanced by the State are judicial exceptions
to the judicially articulated exclusionary rule.  In this case we are dealing
with art. 38.23 of the Texas Code of Criminal Procedure.  The article by its
terms clearly excludes the admission into evidence of any evidence which has
been illegally obtained.  The article contains no exceptions to the rule.  If
there should be exception to the rule, similar to the exceptions which have
been recently made to the exclusionary rule, such a change should come by way
of amendment to art. 38.23, not by our ruling that the evidence is admissible
in direct contradiction to the plain wording of the statute.[[4]]

711
S.W.2d 442, 445 (Tex. App.—Fort Worth 1986, pet. ref’d).  Although we may
certainly revisit the reasoning underlying our prior opinion, we decline to do
so in this circumstance because on no less than two occasions subsequent to Oliver,
the court of criminal appeals has declined to recognize that the federal
inevitable discovery doctrine is an exception to the statutory Texas
exclusionary rule.  See State v. Daugherty, 931 S.W.2d 268, 269–73 (Tex.
Crim. App. 1996); Garcia v. State, 829 S.W.2d 796, 798–800 (Tex. Crim.
App. 1992) (citing Oliver).  Of course, the court of criminal appeals
addressed the inevitable discovery doctrine, not the independent source
doctrine, but the doctrines “are actually two sides of the same coin,” at least
according to the Fifth Circuit.  See Grosenheider, 200 F.3d at
328 n.8.  The Supreme Court has even stated as much:  “The inevitable discovery
doctrine . . . is in reality an extrapolation from the
independent source doctrine:  Since the tainted evidence would be admissible if
in fact discovered through an independent source, it should be admissible if it
inevitably would have been discovered.”  Murray v. United States, 487
U.S. 533, 539, 108 S. Ct. 2529, 2534 (1988) (emphasis omitted).  In light
of the court of criminal appeals’s stance on the inevitable discovery doctrine,
and considering that several federal courts, including the Supreme Court, do
not draw a relevant distinction between the inevitable discovery doctrine and
the independent source doctrine, we are hesitant to depart from our own precedent
regarding the independent source doctrine.

          Further,
unlike the inevitable discovery doctrine, the court of criminal appeals has not
squarely addressed whether or not the independent source doctrine applies in
Texas.  In State v. Powell, police learned that appellee was making
forged checks in his home, and they obtained a warrant to search his home and
to seize, among other things, “checks and materials to make forged checks.” 
306 S.W.3d 761, 762 (Tex. Crim. App. 2010).  When the police executed the
search warrant, they seized two safes—which they could have lawfully searched
since the safes could have contained checks and materials for making forged
checks—and took them to the police station, where they searched them the next
day.  Id.  The safes contained methamphetamine, and appellee was charged
with a drug-related offense.  Id.  The trial court suppressed the
evidence, and the court of appeals affirmed, concluding that the safes were not
particularly described in the warrant as items to be seized.  Id. at 764.

          The
court of criminal appeals disagreed with the lower court.  Id. at 768. 
In part I of the opinion, the court explained that the affidavit stated
that someone had used a forged check to buy a safe at Home Depot and that the
warrant authorized the police to enter appellee’s home and “to there search for
the property described in the affidavit, and to seize the same and bring the
same before me.”  Id. (emphasis removed).  It held that the police could
have seized both of the safes because they could have reasonably believed that
one of the safes was the one that was purchased at Home Depot with a forged
check and that was in the home.  Id.

          In
part II of the opinion, the court of criminal appeals cited Hudson v.
Michigan, 547 U.S. 586, 126 S. Ct. 2159 (2006), which cited Segura,
and concluded as follows:

[A]ssuming that the seizure of the safes by the police
violated appellee’s Fourth Amendment possessory rights in these safes, we
believe that the ‘massive’ remedy of exclusion of the methamphetamine in this
case is not required under the United States Supreme Court’s decision in [Hudson],
which decided that the violation by the police of the knock-and-announce Fourth
Amendment rule that preceded an otherwise lawful search of the defendant’s home
pursuant to a search warrant did not require exclusion of evidence that was
found during the search.

Id. at
769, 771.  Because there was no causal connection between the unlawful seizure
of the safes and the lawful search of the safes, the violation of appellee’s
possessory interests in the safes had nothing to do with the lawful search of
the safes, and the evidence should not have been suppressed.  Id. at
770–71.

          We
decline to construe Powell as impliedly adopting the independent source
doctrine.  First, part II of the opinion is dicta.  The court of criminal
appeals concluded in part I that the safes were not improperly seized
because they were particularly described in the affidavit.  Id. at 768. 
Part II took the analysis an unnecessary step further, “assuming” that the
seizure of the safes violated appellee’s rights.  Id. at 769.  Indeed,
four judges declined to join in part II of the opinion, describing it as
“purely advisory.”  Id. at 772–73 (Price, J., dissenting) (Womack,
Johnson, and Cochran, JJ., concurring).

          Moreover,
it is highly unlikely that the court of criminal appeals would have announced
such a major development in Texas criminal jurisprudence without expressly considering
the interrelationship between the independent source doctrine and article
38.23, as it did in Garcia, 829 S.W.2d at 798–800, and Daugherty,
931 S.W.2d at 269–73, when analyzing the inevitable discovery doctrine, and as
it did in Johnson v. State when considering the attenuation doctrine’s
applicability in Texas.  See 871 S.W.2d 744, 749–51 (Tex. Crim. App.
1994) (“If the evidence is not ‘obtained’ in violation of the law, then its
admission into evidence is not in contravention of Art. 38.23.”).

          Accordingly,
in light of the above authorities, we cannot affirm the trial court’s denial in
part of Wehrenberg’s motion to suppress on the ground that the federal independent
source doctrine applies to except the challenged evidence from the Texas
exclusionary rule.  We sustain Wehrenberg’s only point.

IV.  Conclusion

          Having
sustained Wehrenberg’s sole point, we reverse the trial court’s orders denying
Wehrenberg’s motion to suppress in part and remand this case to the trial court
for further proceedings.

 

 

BILL MEIER
JUSTICE

 

PANEL: 
GARDNER,
WALKER, and MEIER, JJ.

 

PUBLISH

 

DELIVERED:  November 8, 2012









[1]No other established
exceptions to the warrant requirement (voluntary consent and search incident to
arrest) apply here.  See McGee v. State, 105 S.W.3d 609, 615 (Tex. Crim.
App.), cert. denied, 540 U.S. 1004 (2003).





[2]Investigator Montanez did
not say whether the “shake-and-bake” method of manufacturing methamphetamine
had been utilized before the explosion occurred.





[3]At one point during the
hearing on the motion to suppress, Investigator Montanez testified that he had
information that the occupants of the house “were cooking” methamphetamine, but
there is nothing to indicate that he was referring to any evidence other than
the information that was initially relayed to him by the confidential
informant.





[4]Among other authorities,
Wehrenberg moved to suppress the challenged evidence under code of criminal
procedure article 38.23.